# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

MARCUS (DALE) SPIVEY,    )
                          )
    Plaintiff,         )
                          )
    v.                 )      CV 519-091
                          )
ELIXIR DOOR AND METALS    )
COMPANY, a foreign        )
corporation, and O.W. (BILL)  )
BLACKMON, JR., an individual, )
                          )
    Defendants.        )

## ORDER

Before the Court is Defendants' motion for summary judgment, dkt. no. 45.  For the reasons stated below, Defendants' motion is **DENIED.**

## BACKGROUND

Plaintiff Marcus Dale Spivey ("Plaintiff") was employed by Defendant Elixir Door and Metals Company ("Elixir") as an account manager from April, 2018 until his termination on August 21, 2019. Dkt. No. 45-2 ¶¶ 4, 56.  Plaintiff was interviewed and hired by Bill Blackmon ("Blackmon"), the Controller of Elixir, and Plaintiff ultimately reported to Blackmon during his employment with Elixir.  Id. ¶ 5.  During Plaintiff's employment, Blackmon had the sole authority to fire Plaintiff.  Id. ¶ 6.  Plaintiff's job duties consisted of overseeing financial transactions for five

independent divisions, including managing accounts receivable, accounts payable, payroll, tax, and overall compliance. Id. ¶ 7.

On May 21, 2019, Plaintiff was notified at work that his wife, mother-in-law, and two young daughters had been in a catastrophic car accident. Dkt. No. 48-2 ¶ 1. Plaintiff's mother-in-law did not survive, and his wife and two daughters suffered extensive injuries as a result of the accident. Id. ¶¶ 2-8. A few days later, Plaintiff contacted Human Resource Manager Kristie Langston ("HR Langston") to request a leave of absence under the Family and Medical Leave Act ("FMLA"). Id. ¶ 9.[1] Thereafter, HR Langston informed Plaintiff via e-mail that his FMLA leave would run through August 20, 2019 and that his return to work date was August 21, 2019. Id. ¶ 11.

On or about May 24th or 25th, Blackmon visited Plaintiff while Plaintiff was with his family at the hospital. Id. ¶ 12. Blackmon told Plaintiff that Blackmon was under great stress from his boss to meet deadlines and that he therefore needed Plaintiff to return to work to complete the monthly closing process. Id. Further, Blackmon told Plaintiff that he could take leave intermittently and that Elixir would provide him a laptop so that he could work remotely. Id. Blackmon also stated that Plaintiff's return would be something he would consider when discussing bonuses. Id.

---

[1] Neither party disputes that Plaintiff qualified for FMLA to take care of his wife.

Accordingly, Plaintiff returned to the office on June 2, 2019 to close out the month of May but resumed FMLA leave shortly thereafter to take care of his family. Id. ¶ 13.

Sometime in mid to late June, Blackmon visited Plaintiff's home, where Plaintiff was taking care of his wife and child, and told Plaintiff he needed to come into work to take care of a personnel issue with an employee. Id. ¶¶ 14-15. Specifically, Blackmon wanted Plaintiff to suspend employee Pam Troupe ("Troupe"), whom Blackmon labeled as a "trouble maker." Id. ¶¶ 15, 22.[2] Specifically, on June 18, 2019, there was an incident where Troupe allegedly tape-recorded two other employees. Plaintiff sought (and received) Blackmon's permission to meet with HR to determine how to handle this issue, and Plaintiff did so fourteen days after the incident on July 2, 2019. Dkt. No. 48-2 ¶ 23. HR Langston told Plaintiff he needed to do a write-up for all three employees rather than suspend any of them; Plaintiff proceeded with the write-ups as instructed. Id. It is worth noting that

---

[2] This is not the first time Plaintiff had interacted with Troupe. Prior to Plaintiff's termination, Plaintiff recalled one occasion in Spring 2019 when Troupe told Plaintiff that she observed Blackmon viewing pornographic material on his screen at work. Dkt. No. 45-2 ¶ 31. Plaintiff informed HR Langston about Troupe's statement but the matter was not pursued by HR. Id. ¶¶ 33-35. Plaintiff does not have any knowledge as to whether Blackmon knew that Plaintiff reported the incident. Id. ¶ 41. Blackmon stated that Troupe never complained to him about the alleged incident. Id. ¶ 43.

both HR Langston and Blackmon had the authority to meet with these employees and write them up themselves.  Id.

Additionally, when Blackmon visited Plaintiff's home in June, Plaintiff asked Blackmon whether he could perform some duties remotely on the laptop Blackmon offered the previous month.  Dkt. No. 48-2 at ¶ 18.  Blackmon told Plaintiff the laptop had not arrived yet.  Id.  At Blackmon's request, Plaintiff returned to the office on June 26, 2019.  Id.  Blackmon testified that he did approve Elixir's IT to get a company laptop for Plaintiff to perform work from home.  Id. at ¶ 28.  Blackmon told IT Manager Rhonda Willis ("IT Willis") that she could buy a laptop for Plaintiff to use.  Id. ¶ 29.  On July 2, 2019, Plaintiff received the company laptop that IT had set up for him with remote access; however, when Plaintiff tried to use it, the server was not working, and he notified Blackmon of the issue.  Id. ¶ 31.  Five days later, Blackmon—without explanation—texted Plaintiff instructing him to return the laptop to the office.  Id. ¶ 31. Plaintiff complied.  Dkt. No. 45-11 at 95.

About ten days later, HR Langston requested Plaintiff return to work for another personnel matter.  Dkt. No. 48-2 at ¶ 35. While at the office, Plaintiff emailed IT Willis about setting up remote access on his personal laptop, stating:

> I bought myself a laptop and I'm having it shipped here tomorrow or Friday.  Can I get my email set up on that and also is there anyway [sic] to get access into the

> shared file and oracle so I can track what is going on
> while I'm out?  I know we have already done this once,
> but for some reason I was told to bring that laptop back.
> Do we have to have sign off's [sic] for this access?

Dkt. No 48-9.  IT Willis responded: "[t]here is no protocol for
management that I am aware of. You already have the access so I
can just set it up for you." Id.

On August 21, 2019, Plaintiff's FLMA leave ended, he returned
to work, and Blackmon terminated Plaintiff that same day.  Dkt.
No. 48-2 ¶ 51.  Blackmon told Plaintiff that he was terminating
him because (1) Plaintiff "tried to go around him" by asking IT
Willis about setting up his personal laptop, and (2) Plaintiff
gave write-ups to the three employees instead of suspending Troupe.
Id.  HR Langston was present for Plaintiff's termination and took
notes, which state Blackmon told Plaintiff that he was terminating
Plaintiff based upon his "inability to manage his employees" and
"trying to get company programs put on his personal computer."
Id. ¶ 55.  Blackmon also took handwritten notes on the termination
meeting with Plaintiff; under "Reason for Termination" he stated:

> Lack of confidence to lead team.  We are in the process
> of building a new Accounting Team [Plaintiff] came to me
> wanting to Terminate Pam.  I did not feel we had grounds
> to terminate her, however I did feel we could suspend
> her.  (Pam was creating a hostel [sic] work environment
> by secretly taping coworkers and posting on Facebook).
> [Plaintiff] met with Pam, but was unable to do anything.
> He had no follow up conversations with me after that
> meeting with Pam.  Attempt to put company files on
> personel [sic] computer but, did not want anyone
> informed he had done so.  See Rhonda email . . . after
> he was told to return company computer.

[Signature of Bill Blackmon dated August 21, 2019]
Dkt. No. 48-10.  Prior to Plaintiff going on FMLA leave, Blackmon did not have any performance concerns with Plaintiff.  Dkt. No. 48-2 ¶ 52.  There is no evidence of any complaints against Plaintiff before that time.  Nor is there any evidence Plaintiff was not performing his duties properly, had acted inappropriately in any way, or even that Blackmon wanted to terminate Plaintiff.  Indeed, Blackmon had no conversations with anybody about Plaintiff's performance at work.  Id.

At some point while Plaintiff was on FMLA leave, he asked HR Langston what the qualifying events were to switch his family onto the company health insurance.  Id. ¶ 65.[3]  HR Langston told Plaintiff that he would have to wait until open enrollment, so Plaintiff was not able to switch his family over at that time.  At some point after HR Langston disclosed this to Blackmon, he told HR Langston he felt as if there was something "sneaky" about Plaintiff trying to switch his family over.  Id. ¶ 69.  However, Blackmon never mentioned this to Plaintiff as a reason for his termination.  Indeed, none of the termination documents regarding Plaintiff ever mentioned any issue regarding insurance.  Id. ¶¶ 56-59.  In response to Plaintiff's interrogatory asking Defendants to

---

[3] Part of HR Langston's job duties involved discussing health insurance with employees.  Id. ¶ 67.

state the specific reasons they terminated Plaintiff, Defendants

responded:

> Defendant Blackmon's ultimate decision to terminate
> Plaintiff was due to Plaintiff's inability to manage his
> employees and a violation of company policy regarding
> placing company programs on his personal computer
> without prior authorization.

Dkt. No. 48-16 at 7.  It was not until Blackmon's later deposition

that he indicated that Plaintiff's insurance matters were an issue:

> Q: What did you tell [HR Langston] were the reasons that
> you wanted to terminate him?
> . . .
> A: Wanting to -- this was a biggie for me -- wanting to
> circumvent the procedures that were in place to get
> something done.  Get the insurance moved.

Dkt. No. 45-11 at 124.

Plaintiff brings two claims against Defendants Elixir and

Blackmon: (1) interference with and retaliation against protected

leave under FMLA, and (2) retaliation in violation of Title VII.

Dkt. No. 20 ¶¶ 63, 69.  Defendants moved for summary judgment on

both claims.  Dkt. No. 45.  As expressly stated in Plaintiff's

response, Plaintiff does not intend to pursue his Title VII

retaliatory discharge claim.  Dkt. No. 48 at 5, n.1.  Thus,

Defendants' motion for summary judgment as to Plaintiff's Title

VII claims is **GRANTED** as unopposed.  For the reasons discussed

below, Defendants' motion for summary judgment on Plaintiff's FMLA

interference and retaliation claims is **DENIED**.  Dkt. No. 45.

**LEGAL STANDARD**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury [to] return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence

of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).  Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.  Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

Plaintiff argues that Defendants 1) interfered with his ability to take leave, and 2) retaliated against him for taking said leave, both in violation of the FMLA.  Dkt. No. 20 ¶63; 29 U.S.C. § 2615(a).  Specifically, Plaintiff contends Defendants prevented him from taking the full amount of leave to which he was entitled and then terminated Plaintiff for taking said leave. Id. Defendants, in turn, contend 1) that Plaintiff cannot show he was prejudiced in his FMLA interference claim because he did not present any evidence of hours he worked that weren't logged, and 2) that Blackmon had a legitimate reason for firing Plaintiff that was not in retaliation for taking FMLA leave.  Dkt. No. 45.

Under the FMLA, an eligible employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period . . .

[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the FMLA]" as well as "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a). The Eleventh Circuit has recognized that these provisions create "two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against his because he engaged in activity protected by the Act." Lee v. U.S. Steel Corp., 450 F. App'x 834, 837 (11th Cir. 2012); see also 29 U.S.C. § 2615(a)(1)-(2). The Court will turn to each of these claims in turn.

## I.   FMLA Interference Claim

Plaintiff argues that Defendants interfered with Plaintiff's FMLA rights by failing to properly calculate how much time he was out on leave. Dkt. No. 48 at 22. Further, Plaintiff insists that the fact that he was repeatedly instructed to return to work while on leave suffices to preclude summary judgment in Defendants' favor on his FMLA interference claim. Id. Because there is a genuine

issue of material fact as to whether Defendants interfered with Plaintiff's leave time and, further, that this interference prejudiced Plaintiff, Defendants' motion for summary judgment on this ground must be **DENIED**.

To prove FMLA interference, a plaintiff must demonstrate "that he was denied a benefit to which he was entitled under the FMLA," Martin v. Brevard Cnty. Pub. Sch., 543 F.3d 1261, 1266-67 (11th Cir. 2008) (citing 29 U.S.C. § 2615(a)(1)), and that he "has been prejudiced by the violation" in some way, Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002).

It is undisputed that Plaintiff was entitled to the benefit of 480 hours of FMLA leave time. Dkt. No. 45-7. Plaintiff insists that Defendants denied this benefit through failing to properly calculate his FMLA time and not giving him all the time he was granted. Dkt. No. 48 at 22. However, Plaintiff has not provided evidence that demonstrates how the hours were improperly calculated. The only document tracking hours that was submitted to the Court demonstrates that Plaintiff used 482 hours of the 480 hours allotted on FMLA leave. Dkt. No. 45-7. Plaintiff argues HR Langston simply marked off on a calendar when she saw Plaintiff in the office, dkt. no. 48 at 22-23, and as such, he believes this "calendar did not encompass all of the hours he actually worked." Id. Plaintiff does not, however, point to any specific day or instance where the leave hours were misrepresented based on his

work.  Therefore, Plaintiff has not met his burden in showing he was denied a benefit to which he was entitled.

However, that is not Plaintiff's only ground for proving interference.  He also maintains Defendants interfered with his FMLA leave by discouraging him from using his leave and instructing him to return to work to perform certain functions.  Dkt. No. 48 at 23.  Here, the facts submitted by Plaintiff demonstrate that Blackmon instructed Plaintiff to return to work on multiple occasions and even suggested that his return would be factored into his bonus discussion.  Dkt. No. 48-2 ¶ 12.  Specifically, Blackmon requested Plaintiff to return to the office to handle a personnel matter regarding three employees.  Id. 19, 21.  This evidence demonstrates an instance where Blackmon interfered with Plaintiff's attempt to exercise his FMLA rights, and as such arguably denied Plaintiff a benefit to which he was entitled.  See Evans v. Books-A-Million, 762 F.3d 1288, 1297 (11th Cir. 2014).

As to prejudice, the Eleventh Circuit has made clear that an employee is likely harmed when "an employer coerces an employee to work during h[is] intended FMLA leave period and, subsequently, reassigns [or terminates] h[im] based upon h[is] allegedly poor performance during that period."  Evans, 762 F.3d at 1297.  Evans is directly on point here.  Blackmon arguably coerced Plaintiff to return to work to handle a personnel matter.  Plaintiff did so but did not suspend Troupe as Blackmon requested, instead issuing a

write-up to all three employees.  In Blackmon's termination notes, he specifically writes that "[Plaintiff] met with [Troupe], but was unable to do anything."  Dkt. No. 48-10.  Accordingly, a jury could find from these notes that Plaintiff was instructed to handle a work matter during his FMLA leave period and then was subsequently terminated based upon his allegedly poor performance in handling that matter.  Evans, 762 F.3d at 1297; see also Munoz v. Selig Enter., Inc., 981 F.3d 1265, 1275 (11th Cir. 2020) (finding an interference claim can exist where a plaintiff was terminated as a result of a defendant's interference); Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1208 (11th Cir. 2001) ("[A]n employee returning from covered leave is entitled to be restored to his former position or its equivalent.").

Thus, there is some evidence from which a reasonable fact finder could conclude that (1) Defendants interfered with Plaintiff's FMLA leave time and (2) Plaintiff was prejudiced by such interference.  Defendant's motion for summary judgment on Plaintiff's interference claim must be **DENIED**.

## II.  FMLA Retaliation Claim

Defendants next argue that the undisputed evidence shows that they did not retaliate against Plaintiff for taking FMLA leave. Dkt. No. 45-1 at 14.  Plaintiff responds that Defendants did not have a legitimate reason for terminating Plaintiff, and their

13

alleged legitimate reasons were merely pretextual.  Dkt. No. 48 at 8, 12.  Because there exists a genuine issue of material fact as to whether Defendants had a legitimate, non-pretextual reason for terminating Plaintiff, summary judgment is inappropriate.

Where a plaintiff does not point to direct evidence of an employer's discriminatory intent, FMLA retaliation claims are governed by the McDonnell Douglas burden-shifting framework.  See Brungart v. BellSouth Telecomm. Inc., 231 F.3d 791, 798 (11th Cir. 2000) ("[I]n the absence of direct evidence . . . we apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), for evaluating Title VII discrimination claims.").

Under McDonnell Douglas, the plaintiff must first establish a prima facie case of retaliation by showing that "(1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there [was] a causal connection between the protected activity and the adverse employment decision." Wascura v. City of South Miami, 257 F.3d 1238, 1248 (11th Cir. 2001).  If the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action.  Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006).  If the defendant does so, the plaintiff must then show that the defendant's proffered reason is pretextual.  Id.

i.    **Prima Facie Case of Retaliation**

There is no dispute that Plaintiff engaged in protected activity and suffered an adverse action.  Dkt. No. 45-1 at 14. However, Defendants contend that Plaintiff cannot show the necessary causal connection to make out a prima facie case.  Id. Plaintiff insists that he has demonstrated a causal link and point to evidence in the record, including the fact that Defendants terminated him on the very day that he returned from leave.  Dkt. No. 48 at 8.

As a preliminary note, "[t]he causal link element is construed broadly so that a plaintiff merely has to provide that the protected activity and the negative employment action are not completely unrelated."  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (citation omitted).  Close temporal proximity between protected conduct and an adverse employment action is generally "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Hurlbert, 439 F.3d at 1298 (quoting Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000)).  "[T]emporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs."  Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1272 (11th Cir. 2017).

It is undisputed that Defendants terminated Plaintiff on August 21, 2019—the same day he returned from FMLA leave. Dkt. No. 48-2 ¶ 51. This standing alone is likely sufficient to demonstrate a causal connection for purposes of summary judgment. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (discussing temporal proximity between protected activity and an adverse action).

However, Defendants contend temporal proximity is insufficient because, according to Defendants, Plaintiff engaged in protected conduct after engaging in misconduct. Dkt. No. 45-1 at 15 (citing Castillo v. Roche Labs., Inc., 467 F. App'x 859, 863-64 (11th Cir. 2012)). Defendants point to two events that purportedly caused Blackmon to "lose faith" in Plaintiff prior to his engaging in a protected activity. Dkt. No. 45-1 at 17. The first is Plaintiff's request to switch his family over to company insurance. However, as mentioned earlier, this did not become a purported reason for Plaintiff's termination until well into this litigation. Moreover, Defendants failed to identify how Plaintiff's inquiry about his insurance with HR Langston could be construed as misconduct. Indeed, even by Blackmon's own admission, there had been no complaints made against Plaintiff and no indication of any inappropriate conduct that would warrant termination prior to him taking leave. Dkt. No. 48-2 ¶ 52.

Second, Defendants point to Plaintiff's contacting the IT department regarding his remote access. However, it is unclear how Plaintiff's contact with IT could be classified as misconduct, as Defendants acknowledge Blackmon approved Plaintiff's request for remote access, and IT confirmed this approval when Plaintiff asked. Dkt. No. 48-2 at ¶¶ 28-34. In addition, both events occurred during, rather than before, Plaintiff's FMLA leave. As such, Defendants' arguments are without merit in this instance such that temporal proximity, alone, will likely demonstrate the requisite causal connection.

Even if not, temporal proximity is not the exclusive way to show a causal connection. See McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008) (showing a causal connection where the protected conduct and the adverse action were not wholly unrelated). The record also demonstrates that at least one of the reasons Defendant Blackmon decided to terminate Plaintiff was his alleged failure to properly handle a personnel matter that arose while Plaintiff was on leave. Dkt. No. 48-10. Blackmon came to Plaintiff's home and instructed him to return to work to handle a personnel matter that occurred while Plaintiff was on leave. Ultimately, Blackmon's termination notes reflect that Plaintiff "was unable to do anything" regarding the personnel matter and Blackmon's deposition testimony reflects that he had a problem with Plaintiff's three-week delay in handling the matter. Dkt.

No. 48-10; Dkt. No. 45-11 at 83.[4]   Thus, the record arguably supports the inference that Plaintiff's termination is, at least in some regard, causally connected to a situation that occurred during his FMLA leave.

Because Plaintiff has shown enough evidence to allow a reasonable juror to find a prima facie case exists here, Defendants are not entitled to summary judgment on that ground.

### ii. Defendants' Legitimate Reasons for Termination

Once the plaintiff establishes a prima facie case, "the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). "However, the employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" Id. (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)). Defendants have produced non-retaliatory reasons for terminating Plaintiff, including: Plaintiff's IT remote access request, Plaintiff's particular handling of certain personnel matters, and Plaintiff's insurance

---

[4] Plaintiff maintains that it only took Plaintiff fourteen days, rather than three weeks, to resolve the matter.  Regardless, neither party disputes the personnel matter arose while Plaintiff was on FMLA leave.

request.  Plaintiff does not challenge this prong of the McDonnell Douglas burden-shifting framework.

### iii. Pretext

Once Defendants articulate a legitimate reason for Plaintiff's termination, Plaintiff is required to demonstrate that Defendants' reasons were merely a pretext for discrimination. Hurlbert, 439 F.3d at 1298.  To show pretext, a plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Id. (quoting Chapman, 229 F.3d at 1024).

A plaintiff "may succeed in this either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Brooks v. Cnty. Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)).  This second option can be achieved by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation.  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997).  However, a plaintiff cannot show that an employer's proffered reasons for terminating him were pretextual simply by "quarreling with the

wisdom" of those reasons.   See Brooks, 446 F.3d at 1163.   The Eleventh Circuit has "repeatedly and emphatically held" that employers "may terminate an employee for a good or bad reason without violating federal law." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).

"If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment." Wascura, 257 F.3d at 1243.   But a triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Sims v. MVM, Inc., 704 F.3d 1327, 1333 (11th Cir. 2013) (quoting Smith v. Lockheed Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)).

Defendants maintain they should prevail on summary judgment based on Blackmon's belief about Plaintiff's "sneaky" insurance question and Plaintiff's attempt to get remote access without asking Blackmon. Dkt. No. 45-1 at 24.   Plaintiff submits a myriad of reasons supporting his contention that Defendants' proffered reasons are pretextual. Dkt. No. 48 at 12-20.   For clarity's sake, this Court will focus on the two most significant reasons offered.

First, Plaintiff asserts that the temporal proximity here should be a strong contributing factor towards finding pretext.

Id.  Such evidence alone cannot demonstrate pretext, but at least one court in the Eleventh Circuit has indicated it can contribute towards the analysis.  See Vaughan v. World Changers Church Int'l, Inc., No. 1:13-CV-0746-AT, 2014 WL 4978439, at *16 (N.D. Ga. Sept. 16, 2014) ("A jury could infer under these circumstances, and from the one-day period between Vaughan's return from FMLA leave and her termination, that WCCI's proffered reason for firing Vaughan was a pretext to mask its intent to discriminate.").

Second, Plaintiff argues that Defendants' inconsistent justifications for why they terminated Plaintiff constitutes evidence of pretext.  Dkt. No. 48 at 19-20.  Indeed, "shifting reasons given by [a defendant]" allow a jury to find the proffered explanation "unworthy of credence."  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1195 (11th Cir. 2004); see also Tidwell v. Carter Prods., 135 F.3d 1422, 1428 (11th Cir. 1998) ("[T]he identification of inconsistencies in an employer's testimony can be evidence of pretext.").

Here, Defendants' termination notes and documents make clear that their ultimate decision for terminating Plaintiff was based on his "inability to manage his employees" and attempting to place "company programs on his personal computer without prior authorization."  Dkt. No. 48-2 ¶ 60.  Defendants submitted an internal separation report and a Department of Labor separation notice; neither of these documents indicated that Plaintiff's

insurance request was an issue that led to termination. Id. ¶¶ 57-59.   Indeed, these were the only two reasons cited throughout Defendants' answer and interrogatory responses.   However, in moving for summary judgment, Defendants now rely on Plaintiff's "sneaky" insurance conduct as one of their proffered justifications.   Dkt. No. 45-1 at 22.   Indeed, during his deposition Blackmon swore this was "the biggie."   Dkt. No. 45-11 at 124.   Conspicuously, Defendants do not reference the personnel matter that occurred during Plaintiff's FMLA leave that was previously stated as a justification by Blackmon.   Simply put, Defendants have added a new justification post-hoc and pivoted from a prior justification found in termination documents.   Such "shifting reasons" have consistently been held to be evidence of pretext.   See, e.g., Cleveland, 369 F.3d at 1194-95.

Moreover, Plaintiff insists that the only consistent reason provided by Defendants—namely, the IT request—is not worthy of credence.   Dkt. No. 48 at 20.   Defendants argue that the proffered reasons are not pretextual because Blackmon had reasonable and honest belief that Plaintiff should be terminated.   Specifically, Defendants submit that Blackmon honestly believed that he had to terminate Plaintiff.   Dkt. No. 45-1 at 24.

Inconsistencies and contradictions in a defendant's proffered reasons support a conclusion that "a reasonable fact finder could find all of those reasons unworthy of credence."   Ham v. City of

<u>Atlanta</u>, No. 1:07-CV-0309-BBM, 2009 WL 10668572, at *6 (N.D. Ga. Aug. 19, 2009), <u>aff'd,</u> 386 F. App'x 899 (11th Cir. 2010).  Here, Blackmon's belief about the IT issue seems to have multiple inconsistencies.  For one, Blackmon came to Plaintiff's home and told Plaintiff that Elixir would provide him a laptop to work remotely.  Dkt. No. 48-2 ¶ 12.  Blackmon's request for Plaintiff to work, remotely if necessary, directly contradicts his contention that Plaintiff lacked authorization to do so.  It is also undisputed that Blackmon, at one point, did approve the IT department to issue remote access to Plaintiff.  Dkt. No. 48-2 ¶ 28.  Additionally, Plaintiff's "going behind [Blackmon's] back" was reaching out to IT to inquire if he was permitted for remote access for his personal computer; the email to IT Willis makes clear that he never attempted remote access without approval.  Dkt. No. 48-9.  Moreover, IT Willis's response to Plaintiff clearly states: "You already have [remote] access so I can just set it up for you."  <u>Id.</u> at 1.  This response also directly undermines Blackmon's statement that Plaintiff lacked authorization for remote access.

Taking the facts in a light most favorable to the Plaintiff, a reasonable juror could find these inconsistencies and contradictions lend credence towards a finding of pretext.  As a result, this Court finds there exist genuine issues of material fact and summary judgment is therefore **DENIED.**

**CONCLUSION**

For the above reasons, Defendants' motion for summary judgment, dkt. no. 45, is **GRANTED in part and DENIED in part.**  The motion is **GRANTED** as unopposed as to Plaintiff's Title VII claim and **DENIED** as to Plaintiff's FMLA interference and retaliation claims.  The parties' proposed consolidated pretrial order shall be due **within thirty (30) days** of the date of this Order.

**SO ORDERED** this 7th day of October, 2021.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA